**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA** :
: **Case No. 21-cr-112 (CJN)**
**v.** :
:
**DAVID C. MISH, JR.,** :
:
**Defendant.** :

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence David Mish to 30 days of incarceration and $500 in restitution.

## I. Introduction

The defendant, David Mish, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' worth of property damage. The defendant stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

Here, the defendant's participation in a riot that succeeded in delaying the Congressional certification renders a short custodial sentence both necessary and appropriate in light of his

extensive criminal history. According to the PSR, David Mish has 19 prior convictions, demonstrating a lack of respect for the law. *See* PSR at ¶¶ 24-42, 45-55. On January 6, 2021, when presented with the realities of what some other rioters were doing – such as spraying police officers with the contents of fire extinguishers – Defendant Mish chose to continue his journey through the U.S. Capitol.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 29 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop, we turn to the defendant's conduct and behavior on January 6.

*David Mish's Role in the January 6, 2021 Attack on the Capitol*

The defendant paid $244.85 to rent a vehicle in Greenfield, Wisconsin the afternoon of January 5, 2021. He made the approximately 13-hour drive, arriving in Washington, D.C. the morning of January 6, 2021. After watching speeches near the White House, David Mish walked to the U.S. Capitol. Mr. Mish entered the west side of the U.S. Capitol Building in a doorway behind the scaffolding. Metadata from a photograph on David Mish's cell phone places him inside the Capitol as early as 2:40 p.m. EST,[1] and his Gmail account places him inside the Capitol as late

[1] As reflected in the Statement of Offense, individuals forced entry into the U.S. Capitol shortly after 2:00 p.m. *See* ECF No. 29 at ¶ 5.

as 3:09 p.m. EST. By Mr. Mish's estimate to law enforcement, he was in the Capitol Building for an hour, give or take 30 minutes.

David Mish entered the Capitol carrying flags supporting former President Trump, which he waved while inside the Capitol. Defendant Mish is visible holding these flags in the below screenshot.



The government is not aware of the defendant's presence in any particularly sensitive areas inside the Capitol and, based on the location data we have, believe he stayed in the common areas on the House side of the Capitol Building. At one point, Mr. Mish entered a bathroom near the Speaker's Lobby and came out near the door leading to the Speaker's Lobby, at which point he heard the gunshot fired by law enforcement at Ashli Babbitt. Mr. Mish took some photos and video on his cell phone while inside the Capitol. The defendant left Washington, D.C. the afternoon of the riot and drove home to Wisconsin. Additional details of Defendant Mish's conduct on January 6, 2021 come from his statements to law enforcement, as described more below.

David Mish has admitted that he knew he did not have permission to enter the Capitol building and that he acted with the intent to parade, demonstrate, or picket within the building. *See* Statement of Offense ¶ 10.

*David Mish's Interviews with Law Enforcement*

Law enforcement first learned of David Mish's involvement in the January 6 riot when he reached out to provide information to the Metropolitan Police Department ("MPD"). On January 7, 2021, Mish contacted MPD stating he had information to provide about the fatal shooting of Ashli Babbitt. A MPD detective investigating the shooting, John Hendrick, called the defendant on January 8, 2021. At the beginning of that conversation, Mr. Mish stated he had gone in the Capitol Building and asked if he was going to go to jail. *Call with Det. Hendrick* at 1:00-1:09. Detective Hendrick explained that he was not investigating Mr. Mish's actions and could not say whether or not he would be arrested. *Id.* at 1:18-1:28. Detective Hendrick explained that his investigation pertained to the officer's use of force and that he had no role in the federal agencies' investigations pertaining to other aspects of January 6. *Id.* at 1:28-1:52.

David Mish went on to say that he entered the "back" after going up the stairs near the scaffolding and hearing others yell, "breach the building." *Id.* at 2:19-2:25. Mr. Mish described being in a bathroom, where he saw someone break the mirror, leading him to ask that individual why he did that. *Id.* at 4:14-4:53. Mish said he then heard, but did not see, the shooting of Ashli Babbitt as soon as he exited the bathroom. *Id.* at 5:18-5:20, 8:22-8:26. He described Babbitt as in the front of the "pack" telling an officer at the doorway, "Just open the door. They're not gonna stop," or words to that effect, referring to the crowd gathered at the doorway. *Id.* at 5:35-5:55. Mr. Mish said he felt bad for Ms. Babbitt, noted the officer was under a lot of pressure, and agreed to

send Detective Hendrick the video he had taken inside the Capitol.[2] *Id.* at 9:20-9:30, 11:25-11:51. Mr. Mish also made a comment appearing to downplay the violence and destruction inflicted on January 6, stating, "The violence that they're talking about? Oh cut it out. There was three windows. You better knock it off. You come to Kenosha, Wisconsin and I'll show you violence. That went down." *Id.* at 11:13-11:23.

Mr. Mish provided Detective Hendrick with a description of the clothing he was wearing on January 6, 2021: a black sweater, blue jeans, black shoes, and a blue "blue lives matter" hat with a United States flag on it. *Id.* at 2:34-2:55. This accurate description allowed law enforcement to review video footage and locate David Mish in that footage.

Defendant Mish also participated in a custodial interview when he was arrested on January 15, 2021. He provided additional details about his conduct on January 6, 2021 and appeared to be largely forthcoming. He admitted entering the Capitol and said he went to the events of January 6 alone. *Interview of David Mish*, File 1 at 12:04-12:06. Mr. Mish explained that, in response to hearing crowd members near the White House speeches say they were going to the Capitol, members of the Secret Service told them not to go to the Capitol. *Id.* at 15:30-15:50. Defendant Mish said others were already on the lawn by the time he arrived at the Capitol and that he mistakenly thought police officers were letting them in because a civilian was holding the door and police officers who saw them entering did not say anything. *Interview of David Mish*, File 1 at 18:19-18:23; File 3 at 23:15-23, 24:35-24:47). Mr. Mish said that many others had entered the Capitol Building before him and that, while inside, he saw two men grab fire extinguishers and

[2] Mr. Mish did e-mail a link to a Google Drive folder, although law enforcement was not able to open the content.

spray the contents at two police officers. *Interview of David Mish*, File 1 at 24:55-25:12; File 3 at 23:28-23:34, 25:24-25:31.

Defendant Mish also told law enforcement that, when officers told rioters to leave, he tried to do so and, after having to adjust his path, did exit. *Interview of David Mish*, File 2 at 8:05-9:56. After exiting the Capitol, David Mish said he called his daughter and heeded her advice to leave Washington, D.C. *Id.* at 9:57-10:06. Defendant Mish said that entering the Capitol was a "bad decision" and that he should not have gone inside. *Interview of David Mish*, File 1 at 8:25-8:27, 9:01-9:02; File 3 at 24:50-24:53. Additionally, he said that he did not think the individuals who made things turn violent on January 6 were supporters of President Trump. *Interview of David Mish*, File 4 at 16:38-16:40. Similarly, Defendant Mish said the person who broke the bathroom in the mirror did not look like a supporter of former President Trump. *Interview of David Mish*, File 2 at 2:02-2:17.

*The Charges and Plea Agreement*

On January 15, 2021, David Mish was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D), (E), and (G). That same day, he was arrested at his home in West Allis, Wisconsin. On February 11, 2021, David Mish was charged by Information with 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 30, 2021, he pleaded guilty to Count Four of the Information, which charged a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. In his plea agreement, David Mish agreed to pay $500 in restitution to the Department of the Treasury.

## III. Statutory Penalties

The defendant now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). We therefore turn to these factors.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. So, too, does the conviction this

defendant now faces. Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6 is not like picketing at the Capitol some other day, without other rioters present.

While each defendant should be sentenced based on his or her individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and likely would have smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive or dispositive, they help to place each defendant on a spectrum as to his or her fair and just punishment.

No later than 2:40 p.m., David Mish entered the Capitol through a door on the west side of the building behind the scaffolding. While inside, he waved flags and took some photographs on his cell phone. When he exited a bathroom near the Speaker's Lobby, he heard the shooting of Ashli Babbitt and took some video on his cell phone. He was last placed in the Capitol at 3:09 p.m., meaning he spent at least 29 minutes inside. While inside, he saw two rioters spray fire extinguishers on police officers.

The government has no evidence that David Mish personally engaged in any violence or destruction of property or incited others to do so; nor that he destroyed evidence after the riot; nor that he wrote anything with respect to the riot on social media. He entered the Capitol after others had breached it; according to him, at that point, police officers nearby saw more people entering and did not attempt to stop them. The defendant undoubtedly saw signs of damage; a photograph recovered on his cell phone depicts a broken window, and he witnessed the breaking of the large bathroom mirror. These things did not cause him to exit the Capitol. Of greater magnitude, he witnessed violence towards the police offers who were sprayed with the fire extinguishers.

David Mish is not known to have entered any particularly sensitive areas of the Capitol and, according to him, tried to leave the building when officers told him to do so. He contacted MPD the day after the riot to provide the information he had on the shooting of Ashli Babbitt, realizing it identified himself as a participant in the events of January 6. David Mish also voluntarily spoke to law enforcement after his arrest and provided many details about his actions that would otherwise be unknown. That weighs in favor of the defendant, as do his statements – albeit after he had been arrested – that he should not have entered the Capitol and that doing so was a bad decision. While the government believes the nature and circumstances of the defendant's

offense supports a sentence of incarceration, it acknowledges the defendant's admonishment of another rioter breaking the mirror and voluntary communications with law enforcement.

**B. The History and Characteristics of the Defendant**

As set forth in the PSR, David Mish's criminal history is long. Although the majority of his convictions are for traffic offenses, the numbers are noteworthy and demonstrate a longstanding lack of respect for the law. Mr. Mish was convicted for Operating While Revoked nine times in just a twelve-year period from 2000 to 2012. *See* PSR at ¶¶ 28-30, 33-34, 36, 38-40. He was also convicted of Operating While Under the Influence three times (in 2006, 2007, and 2011), Operating Without Carrying License three times (in 2009, 2015, and 2019), and No Registration once (in 2019). *See* PSR at ¶¶ 31-32, 35, 37, 41-42.

Mr. Mish's criminal history goes beyond traffic offenses, however. He was convicted of Sex with Child 16 or Older (Misdemeanor) as well as Child Abuse – Intentionally Cause Harm, both in 1998. *See* PSR at ¶¶ 24-25. At the time of those arrests, he was 18 and 19 years old, respectively. *Id.* In the latter case, he was also initially charged with Robbery with Use of Force – Attempted, which was dismissed when his *Alford* plea was entered. *See* PSR at ¶ 25. In 1998, he was also convicted of Possession With Intent to Distribute THC (less than 500 grams) and Bail Jumping. *See* PSR at ¶¶ 26-27.

Although many of these offenses were in Mr. Mish's youth, the breadth and nature of the non-traffic charges along with the consistent, repeated conduct of the traffic charges are of concern to the government. The defendant also has a host of additional arrests.[3]

[3] These arrests include for Battery in 1998 (PSR at ¶ 45); Operating While Revoked in 2001, 2003 (twice), and 2014 (PSR at ¶¶ 46-48, 53); Bail Jumping in 2009 and 2011 (PSR at ¶¶ 49, 51); First Degree Sexual Assault of Child – Sexual Contact with Person Under Age 13 and Incest with Child

To Mr. Mish's credit, he is employed as a construction finisher where he makes a livable wage. PSR at ⁋⁋ 77-78. David Mish obtained his GED in 1999 and has two living adult daughters. PSR at ⁋⁋ 62, 73. He reports self-medicating for ADHD with marijuana, which he uses regularly. *See* PSR at ⁋⁋ 70-71. Mr. Mish declined to submit a urinalysis sample to the U.S. Probation Office for the Eastern District of Wisconsin on September 21, 2021. PSR at ⁋ 72.

The government also notes that, shortly after the government extended the misdemeanor plea offer to him, Mr. Mish accepted it. The defendant should receive credit for that early acceptance of responsibility, which the government has considered in making its sentencing recommendation.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases

---

in 2009 (PSR at ⁋ 50); Battery and Possession of a Controlled Substance (THC) in 2012 (PSR at ⁋ 52); and Contempt of Court in 2015 (PSR at ⁋ P55).

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v.*

*Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Although the government has no evidence that David Mish participated in violent or destructive behavior, his presence at the Capitol – along with that of all of the rioters – allowed January 6, 2021 to become the day it was. The defendant's decision to enter the Capitol and stay inside, despite the sights he witnessed, comes in a context of a long criminal history. The government acknowledges many of those offenses pertain to traffic offenses and happened years ago, but a criminal history of this length and variety demonstrates a longstanding lack of respect for the law and the need for specific deterrence. David Mish has had many opportunities to reflect on his involvement in the criminal justice system, yet he still chose to illegally enter the Capitol building. He now describes that decision as bad and has accepted responsibility for his actions by entering this plea agreement. However, his stated hesitancy to believe that any supporters of former

President Trump went intending violence or were responsible for violence perpetrated at the riot suggests a failure to acknowledge the full consequences of what happened on January 6, 2021. *See Interview of David Mish*, File 4 at 15:46-16:02, 16:38-16:40. These considerations underscore the need for specific deterrence in this case.

**E. The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on his or her individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government invites

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The defendant has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences among defendants who participated in the Capitol breach on January 6, 2021. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See*

*United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69-71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful

transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increases and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's decision to contact police and admit involvement as well as on-scene efforts to admonish destructive behavior.

Taking into account the defendant's criminal history, the government's request avoids unwarranted sentencing disparities. Two other defendants whose criminal history served as a determining factor at sentencing are Robert Bauer and Edward Hemenway, who were charged as co-defendants in *United States v. Robert Bauer and Edward Hemenway*, 21-cr-49 (TSC). In that case, the government requested the same sentence requested here for David Mish: 30 days of incarceration and $500 in restitution. Both Bauer and Hemenway entered guilty pleas to the same count as David Mish (one count of 40 U.S.C. § 5104(e)(2)(G)) after being charged by Information with the same four charges that were charged against Defendant Mish (18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G)). Judge Tanya S. Chutkan sentenced both Bauer and Hemenway to 45 days of incarceration, 60 hours of community service, and $500 in restitution.

To support its request for 30 days' incarceration of Bauer, the government pointed to the following factors: (1) although Bauer admonished other rioters not to assault law enforcement officers, he treated the chaos and disorder around him as an entertaining spectacle, even posing for

a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised; (2) Bauer remained inside the Capitol for a brief period of time – approximately 17 minutes – yet made his way into the Crypt, where police officers were being attacked; (3) Bauer admitted to his actions only two days after the riot and accepted responsibility early through a plea agreement; (4) Bauer has not expressed true remorse for his actions, stating to the FBI, "I don't feel like I done nothing terribly wrong"; and (5) Bauer has a serious criminal history. The government relied on many of the same factors regarding Hemenway, with the differences being that Hemenway did not admonish other rioters to not assault law enforcement, admitted to his actions a few days after the riot, and expressed remorse for his actions. 21-cr-49, ECF No. 33 at 2.

Bauer's criminal history involved Operating a Motor Vehicle Alcohol-Drugs in 1999, when he was 21 years old; Possession of Anhydrous Ammonia and Vandalism in 2005; Possession of Methamphetamine, Manufacturing Methamphetamine and related charges in 2005; and Unlawful Possession of Meth Precursor in 2006. *Id.* at 11-12. Hemenway's criminal history dated back to 2004 and involved a conviction for Sexual Battery and Criminal Confinement in 2006. 21-cr-49, ECF No. 32 at 11.

Like Defendant Mish, neither Bauer nor Hemenway was personally involved in acts of violence or destruction, although all three did see officers assaulted by rioters. Bauer admonished other rioters not to assault law enforcement, and Defendant Mish admonished the rioter whom he saw break the mirror. Bauer, Hemenway, and Defendant Mish all accepted responsibility early. Defendant Mish has a longer criminal history than Bauer or Hemenway and was inside the Capitol for a longer period of time than they were. However, Defendant Mish contacted MPD to provide his observations from the time around the shooting of Ashli Babbitt, realizing that he was at risk

of being arrested for his presence inside the Capitol. The sentences requested and imposed for Bauer and Hemenway show that the requested sentence for David Mish avoids unwarranted sentencing disparities.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence David Mish to 30 days of incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

        Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: Christine Macey
CHRISTINE M. MACEY
D.C. Bar No. 1010730
Assistant United States Attorney
Fraud Section
U.S. Attorney's Office
555 4th Street, N.W., Room 5243
Washington, D.C. 20530
(202) 252-7058
Christine.Macey@usdoj.gov